UNITED STATES of America, Appellee,

v.

**Robert D. GOODOAK,**
**Defendant, Appellant.**

**No. 87–1216.**

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1987.
Decided Jan. 8, 1988.

from a final judgment.

Thomas E. Dwyer, Jr. with whom Maurice T. Cunningham and Dwyer & Murray, Boston, Mass., were on brief, for defendant, appellant.

Michael G. Tracy, Sp. Asst. U.S. Atty., with whom Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

This appeal presents the question whether, in a trial on a charge of attempted extortion, the target of the alleged threats may testify to and explain his state of mind at the time he allegedly was threatened. We hold that such evidence is relevant and that the particular state-of-mind evidence admitted in this case was not unfairly prejudicial. We therefore affirm appellant's conviction.

## I.

Appellant Robert D. Goodoak was found guilty by a jury of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982).[1] The evidence at trial indicated that between 1975 and 1979, Goodoak had performed various consulting services for the East Bay Development Corporation in connection with East Bay's real estate development projects in the Boston area. These services apparently included making illegal payoffs to public officials to grease the ways for East Bay projects. Goodoak believed that he had not adequately been compensated for these services, and law enforcement officials were pressuring him to reveal what he had done for East Bay. Therefore, in August of 1980, Goodoak began urging East Bay officials to pay up.

East Bay itself had come under federal scrutiny in connection with the payoffs and agreed to cooperate with the FBI in January of 1981. Thereafter, FBI Agent John Callahan began posing as an East Bay operative and handling East Bay's negotiations with Goodoak. Callahan taped his conversations with Goodoak, and these tapes along with Callahan's explanatory testimony formed the bulk of the government's case-in-chief. The tapes contained remarks by Goodoak that the jury could reasonably have interpreted as threats that, unless East Bay paid Goodoak a substantial sum of money, Goodoak would tell the authorities about his illegal activities on East Bay's behalf.

There was also evidence from which the jury could reasonably have concluded that Goodoak had used threats of physical injury in his attempt to obtain payment from East Bay and that Goodoak had the ability to make good on these threats. The jury heard a tape of a November, 1982 conversation with Callahan in which Callahan referred to an organized crime group in Somerville, a city adjacent to Boston where one of East Bay's projects was located. As Callahan referred to the Somerville group, Goodoak said "Well, then you know who I am then. All right." Goodoak went on to refer to a rival group in neighboring Charlestown as "the opposition." In the same conversation, Callahan said he had heard that one Jimmy Wakely, who had the "security contract" for East Bay, had "put the word on" an individual who had been making trouble for East Bay. The following colloquy ensued (ellipses in original):

Goodoak: Well no, that's exactly true, but, ah, Jimmy, ah, Jimmy worked with me and, ah, Jimmy can't do anything unless I okayed it. So what, ah, I'm just saying that this is, this is the situation. I know everything that happened and, ... I think your shopping center is gonna be one of the best shopping centers even with your other security because the word is out that nothing's to happen there and ...

In Somerville, and it's still staying that way up to today, so, ah ...

Callahan: Are you trying to tell me something? (Laughs).

1. Goodoak was acquitted of the charge of conspiracy to commit extortion. A co-defendant, William F. Fahey, was acquitted of charges of conspiracy and aiding and abetting Goodoak's attempt; Fahey is not a party to this appeal.

Goodoak: Oh no, oh no, ah, no, that, that I will tell to the proper people if I have to tell them. It depends, it depends strictly what happens here between you and me.

In late March of 1983, Callahan told Goodoak that East Bay did not intend to pay him anything. Ten days later, Callahan received a call from Somerville tax assessor Robert Campo, who said that he had received an anonymous phone call threatening him and Callahan with violence unless East Bay paid Goodoak. On April 11, 1983, Callahan called Goodoak to complain about the threats; Goodoak replied that "the last thing you told me where I went out you said do whatever I have to do. So I'm telling everyone exactly that ... I'm being ah not dealt with in good faith and I'm telling everyone." Callahan asked Goodoak whether he thought threats of legs being broken went "a little bit over board," and Goodoak replied "No, I don't. Not a bit." He warned Callahan that "if you're street wise, you'd better really start to think because once I stop I can't stop. I as a matter of fact I have no control. They wouldn't even take Jimmy Wakely because he's too easy. They wouldn't use him he's too easy too good guy. I don't know whether you know what you're going into...." After further negotiations, in February of 1984 Callahan turned a sum of money over to Goodoak in exchange for Goodoak's promise that no harm would come to East Bay or Callahan. Goodoak was then arrested.

At trial, after the tape of the April 11 conversation was played for the jury, the government asked Callahan to describe his state of mind as of the end of the conversation. Over defense objection, Callahan testified that he was "very concerned." In response to a series of questions about he reasons for his concern, Callahan stated, again over defense objection:

I knew now after that phone call that Goodoak was making threats. I also knew from what Goodoak had told me in the past of his association with some people that he could cause these threats to be carried out.[2]

... Mr. Goodoak told me in the past he was very close to Jimmy Wakely. In fact, he said Wakely couldn't do anything without checking with Goodoak first. The conversation in November of 1982, Goodoak and I were talking about the Somerville–Charlestown gang war between those two organized crime groups. Mr. Goodoak referred to the people from Charlestown as the enemy. We were talking about Somerville. He said, "Well, then, you know who I am."

... I also knew at this time from what Mr. Goodoak told me that he was associated with the Somerville organized crime group, that being the Winter Hill Gang, and I also knew that group is still flourishing.

At this point, Goodoak moved for a mistrial, arguing that Callahan's testimony that the Somerville group was called "the Winter Hill Gang" and was "still flourishing" was unfairly prejudicial. Goodoak asserted that the prejudicial effect could not be cured with a limiting instruction. The court denied the mistrial motion.

## II.

On appeal, Goodoak makes two main arguments. First, he asserts that evidence of the intended victim's[3] state of mind is irrelevant in a prosecution for attempted extortion. Second, he maintains that, even

---

**2.** At this point, the district court *sua sponte* instructed the jury that "when the Agent says that he knew, you're not to take that as meaning that it was so. The questions were intended to adduce what his state of mind was, what his view was at that time." Goodoak claimed at the time that this limiting instruction was inadequate, but he never identified in what respect it was deficient. Nor did he propose any additional language, either at the time or after the district court gave its final charge. In view of this default, and of our conclusion *infra* that it was proper to permit Callahan's testimony, we do not reach Goodoak's claim on appeal that the court should have given an additional instruction on this issue.

**3.** For convenience only, we will refer to a target of alleged threats as a "victim" or "intended victim." We of course recognize that these terms are not technically proper unless the alleged threats are shown actually to have occurred.

if such evidence is relevant, Callahan's testimony explaining his state of mind should have been excluded as unfairly prejudicial. We consider these arguments in turn.

A.  *State-of-Mind Evidence*

The Hobbs Act, 18 U.S.C. § 1951, makes it a felony to obstruct, delay, or affect commerce by extortion, or to attempt or conspire to do so.  Section 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  It is settled that to prove extortion it is necessary to show the generation of fear in the victim.  *United States v. Kelly,* 722 F.2d 873, 878 (1st Cir.1983), *cert. denied,* 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984); *see also United States v. DiCarlo,* 565 F.2d 802, 807 (1st Cir.1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978).

It is equally well-settled that to prove attempted extortion it is sufficient merely to show an attempt to generate fear in the victim.  *E.g., United States v. Gambino,* 566 F.2d 414, 419 (2d Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed. 2d 802 (1978); *United States v. Frazier,* 560 F.2d 884, 887 (8th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed. 2d 58 (1978); *United States v. Quinn,* 514 F.2d 1250, 1267 (5th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976); *Carbo v. United States,* 314 F.2d 718, 741 (9th Cir.1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964).  Because evidence that the attempt was successful is not necessary, Goodoak argues, evidence of actual fear is irrelevant.  Thus, he says, Callahan should not have been allowed to testify that he was "very concerned" by Goodoak's threats.

■ We disagree. In deciding whether the defendant's words and acts amounted to an attempt to induce fear, the jury is surely entitled to know whether those words and acts did in fact induce fear. Evidence that the defendant's conduct frightened the victim makes it more likely that the defendant was in fact attempting to frighten the victim.  Conversely, evidence that the victim was not frightened makes it less likely that the defendant made such an attempt.

■ Of course, such evidence is by no means conclusive.  Other evidence (including demeanor evidence) might show that the "victim" who testifies to his fear was so fainthearted as to feel fear even where an ordinary person might not have felt threatened.  Or, in the case of an intended victim who testifies that he was not afraid, other evidence might show that he was made of unusually stern stuff, or that he felt safe from harm because he was cooperating with government agents or was himself a government agent.  The key question remains that of whether there was an attempt to frighten, not whether fear actually was produced.  As these scenarios suggest, state-of-mind evidence will be most relevant to that question where the defendant knew or reasonably should have known that his actions would produce such a state of mind in the victim.  Where, on the other hand, the defendant did not expect and should not have expected to produce a given state of mind, evidence that such a state of mind resulted will tell the jury little about whether the defendant in fact attempted to frighten the victim.

■ We do not, however, mean to endorse a far-ranging inquiry at trial into whether an intended victim possesses more or less than the average degree of fortitude.  The focus should remain on the attempt rather than the result, and the court should exercise its discretion under Rule 403 of the Federal Rules of Evidence to exclude state-of-mind evidence where it would produce unfair prejudice, confusion, or waste of time.  We merely hold that evidence of the result is relevant to whether there was an attempt.  There was thus no error in permitting Callahan to testify that he was "very concerned" about Goodoak's remarks.

B.  *Evidence Explaining State of Mind*

■ Goodoak next argues that Callahan's testimony explaining the reasons for

his concern should have been excluded as unfairly prejudicial under Rule 403. In particular, Goodoak argues, the court should have excluded Callahan's statements about Goodoak's alleged organized crime connections. In Goodoak's view, the limited probative value of this testimony was substantially outweighed by the danger of unfair prejudice engendered by associating him with organized crime.

We disagree with Goodoak's assessment of the probative value of Callahan's testimony. Goodoak makes much of the fact that in his November 1982 conversation with Callahan, it was not he but Callahan who initiated the discussion of the Somerville and Charlestown organized crime groups. But Goodoak's response was hardly passive or innocent. To the contrary, he took pains to identify himself with the Somerville group, saying, "Well, then you know who I am then," and to say of the Charlestown group that "they're the opposition."

It is possible that Goodoak would never have made such remarks if Callahan had not raised the topic. And it is possible that Goodoak's self-proclaimed association with the Somerville group did not exist in fact but was merely a spur-of-the-moment invention of Goodoak's. But these hypotheticals are irrelevant. What matters is that, in a conversation with Callahan, Goodoak affirmatively claimed a connection to an organized crime group, causing Callahan to be very concerned. We think that Callahan's explanation of why he felt threatened was highly relevant to the question whether Goodoak had threatened him.

■ Goodoak also objects to Callahan's testimony that Callahan knew the Somerville group was "still flourishing" and that this was an additional cause for concern. Goodoak protests that this testimony was not based on anything he had said to Callahan and thus had no probative value on the question whether he had threatened Callahan. Goodoak points out that, in asking Callahan the reasons for his concern, the government had asked him to describe only his reactions to statements actually made by Goodoak. The government did so because defense counsel had argued at sidebar that an open-ended explanation of the reasons for Callahan's concern might prejudicially overemphasize the subject of organized crime.

It is true that Callahan did not testify that his knowledge that the group was "still flourishing" was directly based on any specific statement of Goodoak's. But we note, first, that Goodoak never objected to the remark on this particular basis. Goodoak moved for a mistrial because of the testimony's prejudicial effect, which motion was denied, but he did not move to strike or argue that the remark had little probative value because it was not based on what he had told Callahan. We also note that Goodoak's statement, "Well, then you know who I am then," and his remark about the Charlestown group that "they're the opposition," were both phrased in the present tense. This might well have suggested to Callahan that the group to which Goodoak claimed a connection was still in existence. Thus we are not persuaded that Callahan's testimony went beyond what could be inferred from what Goodoak had actually told him.

■ Assuming *arguendo* that Callahan's answer did rely on information from sources other than Goodoak's statements, we nevertheless think that it was probative on the issue of Callahan's state of mind and thus on the ultimate issue of whether Goodoak had threatened him. The state of mind of an intended victim of extortion depends not only on what the defendant has said or done to the victim but also on what the victim independently believes about the context in which both are operating. Had Callahan not believed that the Somerville group was still operating, he might not have felt concerned by Goodoak's claimed association with that group; had he not felt concerned, the jury might have been less inclined to conclude that Goodoak had threatened him. Therefore Callahan's independent belief about the continued existence of the Somerville

group had ample probative value.[4]

■ Goodoak finally objects to Callahan's testimony that the Somerville group was known as "the Winter Hill Gang." Goodoak correctly asserts that there is no evidence that he ever used this term in his conversations with Callahan; the term must have been known to Callahan independently. But we note again that Goodoak did not raise this objection at the time. And we think that the remark had some probative value on the issue of Callahan's state of mind. Goodoak had, after all, claimed an association with an organized crime group; the fact that Callahan had heard of this group by name could have helped the jury understand how Goodoak's remark affected Callahan.

As the above discussion demonstrates, Callahan's testimony explaining his state of mind had probative value on the key question of whether Goodoak had threatened him, because evidence of the result is relevant to whether there was an attempt. Our discussion would not be complete without pointing out that Callahan's explanatory testimony, even if not based on anything Goodoak had told him, was relevant to that key question in another, more direct sense. In his conversation with Goodoak, Callahan had demonstrated some familiarity with the organized crime situation in Somerville; on this basis, Goodoak might well have assumed that Callahan was aware of the Somerville group's continuing existence and its ability to harm him. Goodoak might thus have felt that all he had to do to threaten Callahan was to claim a connection with this group; he could rely on Callahan to put two and two together and to feel afraid.

■ Stated more generally, we think that whether a defendant has attempted to induce fear in a victim depends only in part on what the defendant has said or done to the victim. It also depends on what the defendant thinks or reasonably should think the victim independently believes about the context in which both are operating. A defendant who points a gun need not announce that it is loaded or that he intends to pull the trigger unless the victim complies with his demands. Likewise, a defendant who threatens a victim in esoteric, veiled, or elliptical language need not offer a simultaneous translation or define his terms, as long as he thinks or should think the victim understands what has been said. *Cf. United States v. DiCarlo*, 565 F.2d at 807 (stating that defendant's "lesson on the alleged political facts of life in Boston could be taken as a thinly veiled reference to payoffs"). We see Callahan's testimony explaining his state of mind as essentially an explanation of this process of putting two and two together. This explanation had probative value because it helped the jury understand how Goodoak's claim of a tie to organized crime formed part of a threat against Callahan.

■ Turning to the question whether unfair prejudice resulted from Callahan's testimony explaining his concern, we find that there was none. The references to organized crime were brief and restrained; the most damning reference, to Goodoak's claimed association with the Somerville group, came directly out of Goodoak's mouth. And we reject Goodoak's claim that Callahan's testimony was actually prejudicial character evidence. Goodoak's claimed association with organized crime was not offered to show that

4. We point out that evidence of the intended victim's independent beliefs is merely a subset of the larger category of state-of-mind evidence. As such, it is subject to the same limitations we discuss in Part II A, *supra*. Thus, the evidence might show that the victim felt afraid only because he viewed the defendant's innocent conduct in the light of an erroneous or highly idiosyncratic independent belief. Conversely, the evidence might show that the victim did not feel afraid only because he independently believed that the defendant could or would not make good on his threat. Neither showing would be conclusive on the question whether there was an attempt to induce fear; the most relevant of the victim's independent beliefs would be those of which the defendant was or reasonably should have been aware. A district court should exercise its discretion under Rule 403 to keep the focus on the attempt rather than the result and thus to avoid a far-ranging inquiry into the intended victim's independent beliefs.

he had acted in conformity with some criminal propensity but to show Callahan's state of mind. *Cf. Carbo v. United States*, 314 F.2d 718, 739–42 (9th Cir.1963) (approving victims' testimony that they knew of Hobbs Act defendant's underworld reputation, where evidence was offered not to show action in conformity with character but to show that defendant had planned to frighten victims), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964).

In sum, we conclude that the district court did not abuse its Rule 403 discretion in permitting Callahan's testimony. *Cf. United States v. Grassi*, 783 F.2d 1572, 1577–79 (11th Cir.) (finding no abuse of discretion in admitting evidence of Hobbs Act defendant's reputed Mafia connections to show victims' state of mind), *cert. denied*, —— U.S. ——, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986); *United States v. Russo*, 708 F.2d 209, 214 (6th Cir.) (same), *cert. denied*, 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983).[5]

*Affirmed.*

---

**5.** In view of our conclusion that Callahan's testimony was proper, we do not reach Goodoak's claim that the district court should have held a *voir dire* before permitting the testimony.