UNITED STATES of America, Plaintiff,

v.

Douglas O. RUEDLINGER and Edwin
P. Carpenter, Defendants.

No. 97–40012–01/02–RDR.

United States District Court,
D. Kansas.

Dec. 24, 1997.

Douglas O Ruedlinger, Leavenworth, KS, David J. Phillips, Office of Federal Public Defender, Topeka, KS, for Douglas O. Ruedlinger, defendant.

James L. Eisenbrandt, Jeffrey D. Morris, Bryan Cave LLP, Overland Park, KS, Edwin P Carpenter, Auburn, KS, for Edwin P. Carpenter.

Richard L. Hathaway, Office of U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This matter is presently before the court upon defendant Carpenter's motion to dismiss. The defendant seeks dismissal of a number of counts of the indictment. Following the filing of this motion, the government sought and obtained a superseding indictment. The court will consider the defendant's arguments as they pertain to the superseding indictment.

The defendant raises a number of arguments in support of his contention that various counts of the indictment do not contain sufficient allegations to constitute a criminal offense. The court shall consider these assertions in the order in which they were raised in the defendant's motion.

■ The sufficiency of an indictment is determined by practical rather than technical considerations. *United States v. Dashney,* 117 F.3d 1197, 1205 (10th Cir.1997). An indictment need only meet minimal constitutional standards. *Id.* An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges he must defend, and enables the defendant to assert a double jeopardy defense. *Id.*

## COUNTS 2 THROUGH 9

■ The defendant initially argues that the mail fraud charges alleged in Counts 2 through 9 must be dismissed because they fail to identify a victim and fail to encompass a property interest. They rely primarily upon *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) for support. The government responds that the failure to identify a victim is not fatal and that it has sufficiently alleged a deprivation of a property interest. The government points out that the indictment alleges that the conspiracy to defraud was to "provide substantial income or revenue" to the defendants and included the "looting of cash and other assets" and extortion to obtain insurance sales. The government suggests, relying on *United States v. Marchese,* 46 F.3d 1020 (10th Cir.1995), *cert. denied,* 515 U.S. 1105, 115 S.Ct. 2251, 132 L.Ed.2d 259 (1995), that the problem noted in *McNally* is not present here.

■ The initial argument raised by the defendant lacks merit and must therefore be rejected. The law is well-settled that an indictment charging mail fraud under 18 U.S.C. § 1341 is sufficient even if it does not identify a specific victim. *United States v. Loayza,* 107 F.3d 257, 260–61 (4th Cir.1997); *United States v. Mizyed,* 927 F.2d 979, 981 (7th Cir.1991), *cert. denied,* 500 U.S. 937, 111 S.Ct. 2065, 114 L.Ed.2d 470 (1991); *United States v. Hatch,* 926 F.2d 387 (5th Cir.1991), *cert. denied,* 500 U.S. 943, 111 S.Ct. 2239, 114 L.Ed.2d 481 (1991). The identity of the fraud victims is not an essential element of the crime of mail fraud.

The defendant next contends, relying on *McNally,* that the mail fraud charges are insufficient because they fail to identify a property interest. The defendant argues that *McNally* requires that the government allege and prove as an element of the offense of mail fraud that the defendant deprived the victim of a property right.

In *McNally,* the Supreme Court held that mail fraud under 28 U.S.C. § 1341 did not extend to a scheme in which a state officer chose an insurance agent to provide coverage for the state and demanded kickback payments from the agent, but in which the state itself was defrauded of no money or property. 483 U.S. at 360–61. The Court stated: "The mail fraud statute clearly protects property rights, but does not refer to the

intangible right of the citizenry to good government." *Id.* at 356. Accordingly, *McNally* limited § 1341 to schemes intended to deprive victims of money or property.

Unlike *McNally*, the instant charges of mail fraud allege conduct within the ambit of § 1341. In the superseding indictment, the government alleges that the defendant engaged in a scheme to defraud in which they obtained insurance premiums through the use of false misrepresentations. There is little question here that the allegations of the indictment are sufficient in that they allege a scheme to obtain property, i.e., money.

## COUNTS 12 AND 13

The defendant next argues that Counts 12 and 13 are defective. He contends that these charges of interstate transportation of stolen, converted or fraudulently obtained proceeds are defective because they fail to allege a deprivation of property rights.

Counts 12 and 13 of the superseding indictment read as follows:

> On or about the dates set forth below, from Florida to the District of Kansas, the defendants, DOUGLAS O. RUEDLINGER and EDWIN P. CARPENTER, did cause to be transported, transmitted or transferred, in interstate commerce, money, in the form of cashiers checks, having a value in excess of $5,000, knowing that the same to be proceeds stolen, converted or taken by fraud:

| Count | Date of Transportation | Item |
|---|---|---|
| 12 | 5/22/92 | Cashier's Check for $323,493 |
| 13 | 5/22/92 | Cashier's Check for $250,000 |

The elements of the offense charged are (1) transporting or causing the transport; (2) in interstate commerce; (3) property exceeding a value of $5,000.00; (4) with the knowledge the property has been stolen, converted or fraudulently taken from its rightful owner. *United States v. Cardall,* 885 F.2d 656, 674 (10th Cir.1989). The indictment sufficiently charges violations of 18 U.S.C. § 2314. The allegations noted by the defendant are not necessary. Accordingly, the court must reject this argument.

## COUNTS 14 AND 15

The defendant next contends that Counts 14 and 15 are defective because they fail to allege a violation of 18 U.S.C. § 1957. The

defendant contends that the government is precluded from charging money laundering for transactions wherein the transaction itself constitutes the specified unlawful activity necessary to support the money laundering charge. The government points out that § 1957 requires only that a monetary transaction take place after receipt of criminally derived property.

The defendant argues that the allegations contained in Counts 14 and 15 are similar to those involved in *United States v. Johnson,* 971 F.2d 562 (10th Cir.1992) and must therefore be dismissed. We must disagree. In *Johnson,* the defendant was convicted of a scheme to defraud where he promised investors that he would provide them with profits through the conversion of Mexican pesos into American dollars. The defendant's scheme required investors to deposit money into the defendant's account with the understanding that he would invest those funds by purchasing Mexican pesos. The defendant was convicted of numerous counts of money laundering that were predicated upon the victims' transfers of funds into the defendant's account. The Tenth Circuit reversed these money laundering convictions, holding that the wirings that were alleged to support the predicate wire fraud crimes were the very transfers of the funds identified in the money laundering transactions. Therefore, the monetary transaction in *Johnson* did not represent proceeds of the wire fraud crime since the wire fraud crime was not complete until the transaction had occurred. As stated by the court in *Johnson:* "Both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity." *Id.* at 569.

At this point, we are unable to conclude that *Johnson* applies here. The essential elements of a § 1957 violation are that (1) the defendant engaged or attempted to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property was derived from specified unlawful activity. *United States v. Massey,* 48 F.3d 1560, 1565 (10th Cir.1995), *cert. denied,* 515

U.S. 1167, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995). The government has alleged in Counts 14 and 15 that the property, i.e., the money, was derived from specified criminally unlawful activity, i.e., a scheme to defraud in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 1341. Thus, the monetary transactions are alleged to constitute an offense separate from the underlying criminal activity. These allegations are sufficient to avoid a dismissal. The court will have to examine the evidence to determine if *Johnson* is applicable here.

### COUNTS 20 AND 21

The defendant next argues that the Hobbs Act charges, Counts 20 and 21, must be dismissed because "the letters which form the basis for the charges fail as a matter of law to constitute coercion." The government argues that the defendants were exploiting the fear of economic harm in these letters and that is sufficient under the Hobbs Act.

Counts 20 and 21 read as follows:

On or about August 25, 1992, in the District of Kansas and elsewhere, the defendants herein, DOUGLAS O. RUEDLINGER and EDWIN P. CARPENTER, did unlawfully obstruct, delay and affect, and attempt and conspire to obstruct, delay and affect commerce as that term is defined in Title 18, United States Code, Section 1951, by extortion, that is the threatened fear of economic harm. The foregoing offense was accomplished by using the United States Mail to correspond with School Districts, through their principals and superintendents. Carpenter informed them that in the opinion of RUEDLINGER, the schools were not receiving insurance equivalent to the insurance that RUEDLINGER could provide through his companies Doug Ruedlinger, Inc. and Fund Insurance Company, Ltd. of Bermuda, which "will most assuredly result in your school getting sued." While the defendants attempted to provide a disclaimer that the letter was solicitation, the letter went on to entreat, persuade and entice the recipient to avoid being sued by contacting The Fund Insurance Company of Bermuda as the only company who could support adequate insurance, i.e., "Life Cat," through the "consent placement by

DRI as the insurance policy in question is a copyrighted instrument."

The indictment further alleges that these letters were mailed to the Hutchinson Public Schools and Blue Valley School District # 229.

The discussion of these counts must begin with a review of the letter that forms the basis of these counts. The letter provides as follows:

This office represents Doug Ruedlinger, Inc., (DRI). On August 3, 1992, DRI received written notice from the Kansas State High School Activities Association (KSHSAA) that its Board of Directors determined that the insurance coverage heretofore provided to your schools through the KSHSAA approved program with DRI would no longer be continued, and the KSHSAA elected to provide insurance coverage through Lincoln National. Your School District should have received a copy of the KSHSAA Board minutes, but as a matter of convenience, we are enclosing a copy for your files.

As a result of the KSHSAA decision to non-renew the insurance coverage offered by DRI, and depending upon whether or not your KSHSAA premium payment was deposited or not, you will receive attached to this letter either a trust account check of our office refunding the premium payment or your check returned. This letter serves as written notice to you as provided by K.S.A. 40–2, 122 of the non-renewal of the coverage commonly known as "Life Cat" or any components thereof including but not limited to any excess medical insurance.

Over the past ten years DRI, as the Administrator of the insurance programs of the KSHSAA has provided to it and its member schools "Life Catastrophe" insurance coverage. The administrative determination to provide such coverage, particularly as it relates to the settlement options and non-suit provisions of the coverage, was done such that the catastrophically injured student and his family would receive meaningful lifetime financial protection without regard to fault and at the same time the schools, staff, coaches, and

others (including the injured student's family) would avoid costly and counterproductive litigation through the non-suit provisions.

Further, it has been determined that since substantially all of the families in Kansas have quality medical insurance, such that excess medical coverage is not utilized, that it would be more practical to utilize the premium dollars for effective insurance coverage that would help both the families and the KSHSAA members, and provide for meaningful insurance that would maximize the use of tax dollars for that purpose.

It is the opinion of the principal of DRI that the KSHSAA member schools do *not* receive equivalent insurance protection through the plan adopted by the KSHSAA Board and the KSHSAA Board was advised by its Administrator, DRI, that the KSHSAA, its directors, officers, and member schools are exposed to potential claims for negligence in the placement of insurance coverages for its member schools because of the decisions that were made. Your school is receiving pure excess medical insurance with liability protection and that is all. In the event a student is catastrophically injured, his family will not materially benefit from this excess medical coverage (unless the family is in the minority who do not have primary medical coverage), and this kind of excess medical coverage will most assuredly result in your school getting sued. Your member school could have received the settlement and non-suit option for the same cost per student. Your member school can *not* get "Life Cat" insurance except through the consent placement by DRI as the insurance policy in question is a copyrighted instrument.

This "Life Cat" insurance coverage is available, and we have advised the principals of DRI that in order to avoid potential claims for the arguably negligent placement of lesser insurance coverage for a no price difference, it has a duty to advise your school in writing of the continued availability of the "Life Cat" insurance program, and the difference between that insurance program and the program through Lincoln National adopted by the KSHSAA

for its member schools. Make no mistake that DRI will not accept any responsibility for the decision of the KSHSAA or for your school district in acquiescing in the insurance program adopted by the KSHSAA for its member schools. This correspondence shall further serve as written notice to you that nonequivalent insurance coverage is being afforded to your school district, and that other options are available to you. DRI, as the former administrator of the KSHSAA insurance program, undertakes no responsibility for the actions of the KSHSAA or you related to the adopted coverage for this school year, and undertakes no duty to further inform you or the KSHSAA of the exposure for the decisions made by its Board as memorialized by the attached notice.

"Life Cat" insurance is available through the Fund Insurance Company, Ltd., Bermuda. Neither DRI, the Fund Insurance Company, Ltd ., or this office is soliciting your participation in "Life Cat" insurance. In the event you desire information concerning the continued coverage of your member school by the utilization of "Life Cat" insurance, as a matter of courtesy to you, the Fund Insurance Company, Ltd., may be contacted in writing as follows:

The Fund Insurance Company, Ltd.

John Neil, Program Manager

P.O. H.M. 1538

Continental Building

25 Church Street

Hamilton, Bermuda HM 12

In the event you desire this coverage, you must initiate contact on your own.

As previously indicated, this office represents DRI. As such, only DRI may rely upon any legal advice given or referred to herein as there is no contractual or other duty to inform you of anything. The information contained in this correspondence considers facts and circumstances as of the date of this letter, and we entertain no duty to inform you of any other matters which may come to our attention.

The defendant contends that the aforementioned letter does not fall within the bounds of extortion under the Hobbs Act because (1)

there is no express or subtle extortionate demand within the letter; and (2) there is nothing wrongful about the letters or their content. In regard to the last argument, the defendant contends there is "nothing within the language of the letters which expresses or implies a threat of economic loss at the direction or control of DRI, Ruedlinger or Carpenter."

 Under the Hobbs Act, extortion that interferes with interstate commerce provokes federal jurisdiction. 18 U.S.C. § 1951(a). Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The extortionist need not actually "obtain" the victim's property because the Hobbs Act expressly permits the prosecution of attempts to extort as well as conspiracy to extort. 18 U.S.C. § 1951(a).

 The portion of the definition of extortion significant to this case is the "wrongful use of ... threatened ... fear." The government contends that the defendants conspired and attempted to induce payment from the schools through the threatened fear of economic harm. The law is well-settled that procuring another's property by wrongful use of that person's fearful mental state violates the Hobbs Act. *United States v. Valenzeno*, 123 F.3d 365, 369 (6th Cir.1997); *United States v. Tomblin*, 46 F.3d 1369, 1384 (5th Cir.1995); *United States v. Flynt*, 15 F.3d 1002, 1007 (11th Cir.1994). Apprehension of economic as well as physical harm may provide the requisite fear. *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987); *see also Valenzeno*, 123 F.3d at 369; *United States v. Sturman*, 49 F.3d 1275, 1281 (7th Cir.1995); *Tomblin*, 46 F.3d at 1384. The fear experienced by the victim must be reasonable under the circumstances. *United States v. Kopituk*, 690 F.2d 1289, 1328 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 2090, 77 L.Ed.2d 300 (1983); *United States v. Tolub*, 309 F.2d 286, 288 (2nd Cir.1962). The inquiry in attempted extortion, however, is whether the threat itself is reasonably calculated to instill fear in the victim. *United States v. Goodoak*, 836 F.2d 708, 712 (1st Cir.1988); *United States v. Haimowitz*, 725 F.2d 1561, 1572 (11th Cir.

1984), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984); *United States v. Quinn*, 514 F.2d 1250, 1267 (5th Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976).

 The question facing the court is whether there is a requirement that the person threatening the economic harm must also be the one that will cause it. The defendant suggests that there is indeed such a requirement. The defendant argues that Hobbs Act charges are premised on communications or action that constitute a wrongful threat of economic harm, i.e., that the extortionist will cause the victim economic harm if his demand or inducement is not complied with. The defendant notes that the letter in question fails to meet that test because the letter contains no threat that DRI, Ruedlinger or Carpenter will do anything if the school districts do not purchase their alternative insurance, only that the use of inferior insurance may result in lawsuits by third parties. The government suggests, relying on *United States v. Boylan*, 898 F.2d 230 (1st Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990), that an express or subtle extortionate demand is not necessary where the defendant is exploiting the fear of economic harm.

 The court believes that the government's argument misses the point. There is little question that the fear necessary for an extortion charge need not be the product of the defendant's action. *See United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 189, 136 L.Ed.2d 127 (1996); *Tomblin*, 46 F.3d at 1384. Moreover, the law is settled that a defendant's threat need not be express. *United States v. Hairston*, 46 F.3d 361, 365 (4th Cir.), *cert. denied*, 516 U.S. 840, 116 S.Ct. 124, 133 L.Ed.2d 73 (1995); *Goodoak*, 836 F.2d at 714. *Boylan*, the case cited by the government, makes both of these points. The court believes, however, that there is a missing element here. We believe an extortion charge requires that the defendant must have the power to hurt the victim in economic terms or the victim must believe that the defendant has the power to hurt him in economic terms. *See Valenzeno*, 123 F.3d at

369; *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987). This concept is so well understood that few cases discuss it. This is the element missing from the charges contained in Counts 20 and 21. The defendants may have sought to both create and exploit an economic fear, but there is no indication that the defendants had the power to carry out the threat. The defendants informed the school districts that they could be sued if they used the insurance offered by the high school activities association. The threat of lawsuits was from third parties, their students, not from the defendants. The defendants neither suggested nor indicated that they could do anything to the school districts if they did not purchase the alternative insurance. Moreover, the circumstances surrounding these letters suggest that it would be unreasonable for the school districts to believe that the defendants had any power to hurt them in economic terms.

This case has some similarity to *United States v. Livingston,* 665 F.2d 1003 (11th Cir.1982). There, the defendant approached the Bassett Furniture Company and told them that he would provide information on embezzlement that was occurring in their business if they paid him $250,000.00. The defendant was not involved in the embezzlement. The Eleventh Circuit determined that the defendant's conduct did not constitute extortion. The court explained:

> The government's contention that Livingston intended to use the fear of economic loss wrongfully is without merit. It is well established that the use of fear of economic loss is proscribed by the extortion statute.... In order to be guilty of the wrongful use of fear, however, a party must cause, or threaten to cause, the economic loss to occur. In the present case the facts shown to the district court did not include a showing that Livingston intended to threaten to cause Bassett economic loss. The scheme contemplated by Livingston and his associates was to offer to inform Bassett of the source of past and current economic loss stemming from the embezzlement, in exchange for a monetary payment. The scheme did not contemplate threatening to cause the embezzlement to continue unless payment was made. There was no factual showing that Living-

ston was involved in the embezzlement or that he knew that any of his associates were involved in it.

*Id.* at 1005.

The threat by the defendants here concerned actions that might be taken by others who the defendants had no control over. The defendants made no threat that they would cause the school districts any economic loss. We believe that such a threat is the essence of extortion and the reason that these counts must fail. In sum, the court shall dismiss Counts 20 and 21 of the superseding indictment.

## COUNT 23

Finally, the defendant asserts that Count 23 is defective because it fails to allege perjury. The defendant argues that this perjury claim is defective because (1) the answers do not form the basis of the alleged perjury; and (2) the answers are immaterial as a matter of law.

Count 23 reads as follows:

> On or about the 6th day of June 1996, in the District of Kansas, the defendants, DOUGLAS O. RUEDLINGER and EDWIN P. CARPENTER, the defendant CARPENTER having taken an oath, that is having sworn on his oath to state the truth, the whole truth, and nothing but the truth, in a Matter of the Grand Jury of the United States of America, sitting in Topeka, Kansas, provided materially false testimony, as follows:

> "Q. Now, if the holding company had been placed into bankruptcy, which included the ownership of Fund Insurance Company, Limited, would the bankruptcy court had to have been petitioned for the approval of the sale of Fund Insurance Company, Limited?

> A. (by Carpenter) That would be true, but in this particular case the transaction related to Fund Insurance Company, Limited, had already been completed. The issue would have been whether or not that particular transaction was an arms-length transaction, and whether or not it could be pulled back into the assets of the bankruptcy.

Q. What happened prior to January 19, 1993, to the Fund Insurance Company in Bermuda?

A. Around January 1st of 1993, Mr. Ruedlinger directed us to prepare an agreement between the Ruedlinger Company, which was then a company owned by his son, Shannon, and Wheatland Group Holdings, Inc., that sold Fund Insurance Company, Limited stock to Ruedlinger Company for one hundred thousand dollars."

In truth and in fact, as the defendants well knew, this material misrepresentation was part of a pattern of activity intended to create the pretense or false appearance that the transfer of the stock of Fund Insurance Company, Ltd. had taken place on January 4, 1993, and that the Consulting Agreement between Fund Insurance Company, Ltd. of Bermuda and The Ruedlinger Company, Inc., was entered into July 1, 1992, when in truth as the defendants well knew these two agreements were backdated.

As indicated, the government contends that the aforementioned testimony constitutes perjury because the defendants knew that the Fund Insurance Company, Ltd. stock transfer agreement and the Fund Insurance Company, Ltd. and The Ruedlinger Company consulting agreement were backdated. The government contends that the stock transfer took place in May 1993, after an involuntary bankruptcy had been filed against Wheatland Group Holdings, Inc. on April 21, 1993.

The defendant points out a variety of problems with this count. He argues that the questions addressed to him were vague and fail to provide the precision necessary for a valid perjury charge. He points out that in the first question the questioner used the ambiguous phrase, "placed into bankruptcy," and that led to an answer that cannot support a perjury charge. He next contends that the second question is irrelevant to the perjury alleged by the government because there is no testimony concerning when the actual stock transfer occurred. The defendant also asserts that the government's ambiguous questions elicited testimony that was immaterial as a matter of law. The defendant points out that when the stock transfer

occurred and whether documents were backdated is irrelevant because the "gap period" created by 11 U.S.C. § 303(f) renders immaterial whether the stock transfer occurred in January 1993 or later, so long as it occurred prior to the order of relief which occurred on November 17, 1993.

▮▮▮▮ The defendant is charged with a violation of 18 U.S.C. § 1621 which provides in pertinent part: "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury." This statute is not to be construed broadly. *Bronston v. United States,* 409 U.S. 352, 358–60, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973); *United States v. Hilliard,* 31 F.3d 1509, 1519 (10th Cir.1994). "A defendant commits perjury if he gives false testimony under oath concerning a material matter with the wilful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Owens,* 70 F.3d 1118, 1132 (10th Cir.1995).

▮▮▮▮ "Precise questioning is imperative as a predicate for the offense of perjury." *Bronston,* 409 U.S. at 362. A perjury conviction cannot be based upon evasive answers or even upon misleading answers so long as they are literally true. In the face of evasion or misleading answers, it is the lawyer's duty "to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Bronston,* 409 U.S. at 358–59. When a line of questioning is so vague as to be "fundamentally ambiguous," the answers associated with the questions posed may be insufficient as a matter of law to support a perjury conviction. *United States v. Manapat,* 928 F.2d 1097, 1099 (11th Cir.1991); *United States v. Yasak,* 884 F.2d 996, 1003 (7th Cir.1989); *United States v. Ryan,* 828 F.2d 1010, 1015 (3rd Cir.1987); *United States v. Lighte,* 782 F.2d 367, 375 (2nd Cir.1986).

■ Having carefully reviewed the allegations of Count 23, the court finds that the perjury charge must be dismissed. The court finds that the ambiguity of both questions renders the answers insufficient as a matter of law to support a perjury conviction. The ambiguity of the first question was created by the questioner who used the term "placed into bankruptcy." In involuntary bankruptcy proceedings, this phrase can have different meanings. It can refer to the time that the petition for involuntary bankruptcy is filed, or it can refer to the time that the order of relief is granted. This means that the defendant's answer could be literally true, even under the government's theory that the stock transfer took place in May 1993, if he understood the term "placed into bankruptcy" to mean when the order of relief was entered. The court finds that a perjury charge cannot stand on this question. We believe that it was incumbent upon the questioner to cure this problem.

The second aspect of the perjury contains an even more fundamental problem. The questioning simply fails to substantiate the government's charge of perjury. The defendant only testified that in January 1993 he was instructed by defendant Ruedlinger to draft documents memorializing the stock transfer. He makes no statements concerning when the stock transfer took place or when the documents were actually drafted. The questioner failed to address these important details. Without any testimony by the defendant that the stock transfer took place in January 1993, we find this part of the charge also insufficient to support a perjury conviction. Accordingly, the court shall dismiss Count 23 of the indictment.

**IT IS THEREFORE ORDERED** that defendant's motion to dismiss (Doc. # 34) be hereby granted in part and denied in part. The court hereby dismisses Counts 20, 21 and 23 of the superseding indictment.

**IT IS SO ORDERED.**