# United States Court of Appeals
## For the First Circuit

No. 18-1027

UNITED STATES OF AMERICA,

Appellee,

v.

JAMBULAT TKHILAISHVILI,

Defendant, Appellant.

No. 18-1098

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID TKHILAISHVILI,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Selya, Circuit Judges.

Michael Tumposky, with whom Hedges & Tumposky, LLP was on brief, for appellant Jambulat Tkhilaishvili.

William W. Fick, with whom Fick & Marx LLP was on brief, for appellant David Tkhilaishvili.

Alexia R. De Vincentis, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

———————————

June 5, 2019

———————————

**SELYA**, **Circuit Judge**.  Victor Torosyan, together with defendants-appellants Jambulat Tkhilaishvili and David Tkhilaishvili, planned to open a suboxone clinic (the Clinic) for the treatment of opioid addiction.  The defendants had represented to Torosyan that they would provide the know-how as long as he furnished the bulk of the necessary financing.  But while Torosyan was depleting his resources in order to get the Clinic up and running, the Tkhilaishvili brothers attempted to relieve him of some portion of his share in the business through extortionate means.  Torosyan blew the whistle and, after a week-long trial, a jury convicted the defendants of conspiring to commit Hobbs Act extortion and other crimes.  The defendants appeal.  After careful consideration, we reverse the judgment of conviction on an embezzlement count brought against David; otherwise, we find the defendants' manifold claims of error either lacking in merit or waived (or in some instances both) and, therefore, affirm the remaining judgments of conviction.  Finally, we remand to the district court for further consideration of David's sentence and the concomitant restitution order in light of the reversed conviction.

## I. BACKGROUND

We start by rehearsing the relevant facts, taking them in the light most hospitable to the verdict, consistent with record

support.  See United States v. DiDonna, 866 F.3d 40, 43 (1st Cir. 2017).  We then recount the travel of the case.

In 2014, David approached Torosyan about opening a suboxone clinic in Quincy, Massachusetts.  David boasted that he and his brother Jambulat had experience running a suboxone clinic but needed a significant capital infusion to get the project off the ground.  Torosyan, who had known David socially, agreed to invest $500,000 in the project.

In December of 2014, the parties entered into a letter agreement establishing the structure of the business and the membership interests of each principal.  Under the letter agreement, the venture consisted of two Massachusetts limited liability companies:  Allied Health Clinic (AHC) and Health Management Group (HMG).  Torosyan received a 41% Class A share in both AHC and HMG; David received a 40% Class A share in HMG and a 4% Class B share in AHC; and Jambulat received a 45% Class A share in AHC and a 5% Class B share in HMG.  The remaining Class B interests in AHC and HMG were reserved for other anticipated employees of the proposed suboxone clinic, all of whom were relatives or former associates of the defendants.

Given Torosyan's role as the primary (indeed, the sole) investor, the letter agreement granted him a special consent authority, which entitled him to decide any contested matters involving the Clinic until his capital investment had been fully

- 4 -

recouped. It also granted him a secured guarantee of 50% of his investment, collateralized by the Tkhilaishvilis' pizza parlor.

With the letter agreement in place, the trio moved forward with their plans to open the Clinic. From Torosyan's perspective, things did not go smoothly. In the Spring of 2015, he learned that the defendants had hoodwinked him about the progress of construction. He also learned of prior violent behavior by the defendants. It was not until August 6, 2015 — months later than anticipated — that the Clinic finally received a certificate of occupancy from the City of Quincy. By then, Torosyan had infused approximately $400,000 of his personal savings into the Clinic.

Matters went downhill from there. On August 22, the defendants asked Torosyan to release his security interest in the pizza parlor so that they could sell that business and focus on the Clinic. Torosyan agreed, but as soon as he had signed the release, the defendants started to threaten him. They demanded that he surrender his special consent authority and relinquish a portion of his ownership interest. They warned that if he refused to comply, they would "burn down the Clinic" and that he and his family were "going to be hurt."

The next day, Torosyan suggested to David that they mediate the dispute in accordance with the letter agreement. David replied that he would "put a bullet in [the mediator's] head" and

said that his brother "shot . . . people in the head." Torosyan was "very, very scared."

Although shaken by this dramatic shift in the defendants' attitude, Torosyan nonetheless decided to move forward with the Clinic. In September, lawyers for Torosyan and the defendants negotiated and drafted formal operating agreements. Except for minor adjustments to the distribution of membership interests, the operating agreements retained most features of the letter agreement (including Torosyan's special consent authority). In addition, the operating agreements included new "duty of loyalty" provisions, which had the potential to trigger forfeiture of any breaching member's ownership interest.

Torosyan and those persons holding minor membership interests signed the operating agreements on September 11. Jambulat signed the following day, after declaring that "contracts mean[t] nothing" to him. He also demanded that Torosyan immediately give 5% of Torosyan's ownership interest to a creditor of the defendants and agree to give 40% of the Clinic's profits to David when the Clinic began receiving reimbursements from insurance companies. Torosyan deflected these demands, saying that he would speak to his lawyer. David, who was traveling, signed the operating agreements sometime within the next few days.

The Clinic opened in October of 2015, after receiving a license from state public health authorities. Around that time,

Torosyan loaned David $3,000, with the understanding that the money would serve as David's salary for November unless repaid within one week. David never repaid the loan but nonetheless withdrew salary payments for November totaling $3,500.

On November 9, David requested that Torosyan meet him at the Clinic. When Torosyan arrived, the defendants asked to speak privately with him in an exam room. Once inside, they locked the door and demanded that he turn over 40% of available Clinic funds to them and cede 5% of his ownership interest to their friend. In Torosyan's presence, David suggested to Jambulat that they needed to "get rid of" him. The threats continued as Torosyan retreated to the parking lot, where Torosyan saw Jambulat withdraw a knife from the glove compartment of David's car.

By then, Torosyan had sunk roughly $580,000 into the Clinic. He reported the threats to his attorneys and thereafter met with agents of the Federal Bureau of Investigation (FBI). At the FBI's behest, he agreed to wear a wire and surreptitiously record conversations with the defendants. In recordings made on November 25 and 30, David made several incriminating statements, reiterating earlier threats, referring to previous violent acts undertaken by both defendants, and suggesting that he had connections with members of Russian organized crime.

On January 6, 2016, Torosyan sought to exorcise the defendants: he invoked the "duty of loyalty" provision to remove

them from Clinic membership.  Shortly thereafter, a federal grand jury sitting in the District of Massachusetts charged both defendants with conspiring and attempting to commit Hobbs Act extortion (counts 1 and 2).  See 18 U.S.C. § 1951.  In addition, David was charged with embezzlement from a health care benefit program (counts 3 and 4).  See id. § 669.

Both defendants maintained their innocence and, in advance of trial, moved to exclude evidence of prior violent acts. See Fed. R. Evid. 404(b).  At a pretrial hearing, the district court ruled such evidence admissible "to the degree that the witness has expressed a concern or is aware of prior acts of violence by the defendants."  A week-long jury trial ensued, and the defendants timely moved for judgment of acquittal.  See Fed. R. Crim. P. 29(a).  The district court reserved decision, see Fed. R. Crim. P. 29(b), and sent the case to the jury, which found the defendants guilty on all counts.

A consolidated sentencing proceeding was conducted on two separate days.  During that hearing, the district court denied the defendants' motions for judgment of acquittal (including a supplemental motion filed by David over the government's objection on the eve of the first day).  The court proceeded to sentence David to four concurrent 36-month terms of immurement followed by a three-year term of supervised release; ordered him to pay a special assessment of $400 ($100 per count), see 18 U.S.C. § 3013;

and decreed that he make restitution in the amount of $3,500. The court sentenced Jambulat to two consecutive nine-month terms of immurement followed by a three-year term of supervised release, and ordered him to pay a special assessment of $200. These timely appeals ensued.

## II. HOBBS ACT EXTORTION

The defendants challenge on three fronts their convictions for conspiring and attempting to commit Hobbs Act extortion (counts 1 and 2). We deal sequentially with these challenges.

### A. <u>Sufficiency of the Evidence.</u>

The defendants' principal challenge is to the sufficiency of the evidence. To the extent that they preserved this challenge, we review the district court's denial of their Rule 29 motions de novo. See <u>United States</u> v. <u>Iwuala</u>, 789 F.3d 1, 8 (1st Cir. 2015). In that process, we evaluate "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." <u>United States</u> v. <u>Chiaradio</u>, 684 F.3d 265, 281 (1st Cir. 2012) (quoting <u>United States</u> v. <u>O'Brien</u>, 14 F.3d 703, 706 (1st Cir. 1994)).

The Hobbs Act forbids conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do."  18 U.S.C. § 1951(a).  Here, the government was required to prove beyond a reasonable doubt both that the defendants conspired and attempted to commit extortion and that their actions affected interstate or international commerce.  See United States v. Cruz-Arroyo, 461 F.3d 69, 73 (1st Cir. 2006).

At the outset, the defendants contend that the evidence presented was insufficient to establish that they either conspired or attempted to commit extortion.  Extortion is defined under the Hobbs Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  Against this statutory backdrop, the defendants focus on the specific conduct referenced in counts 1 and 2:  their attempt to obtain a percentage of Torosyan's ownership interest for their friend.  They theorize that the requisite "obtaining" of property cannot be satisfied by a showing that a third party (rather than the defendants themselves) stood to garner the fruits of the extortion.  In their view, the government had to show that the defendants sought to take possession of the extorted property

for themselves or, at the very least, that they somehow sought to benefit from the extortionate transfer.

This contention is simply wrong. As we recently explained, a defendant may "obtain" property within the meaning of the Hobbs Act by bringing about its transfer to a third party, regardless of whether the defendant received a personal benefit from the transfer. See United States v. Brissette, 919 F.3d 670, 680, 685-86 (1st Cir. 2019) (holding that threatening to withhold event permits if victim did not hire workers from a specific union could constitute "obtaining" for purposes of Hobbs Act). It follows that the government was not required to show that the defendants stood to benefit personally from the extortionate transfer of Torosyan's property to a third party. We therefore hold that the government presented sufficient evidence for a reasonable factfinder to conclude that the defendants conspired and attempted to "obtain" Torosyan's property in violation of the Hobbs Act.[1]

The defendants mount a second challenge to the sufficiency of the evidence: they say that because the Clinic was not profitable at the time of the attempted extortion, an ownership

---

[1] The government argues in the alternative that it presented evidence sufficient to support a finding that the defendants personally sought to obtain property from Torosyan. Because we conclude that the transfer of property to a third party may satisfy the "obtaining" element, we need not reach this argument.

interest in the Clinic was not "property" within the meaning of the Hobbs Act. But there is a rub: "[a] party who identifies an issue, and then explicitly withdraws it, has waived the issue." United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002). So it is here. The defendants advanced this argument in their motions for judgment of acquittal and then abandoned it when, arguing before the district court that the transfer of property to a third party could not comprise extortion, they conceded that property was involved and agreed with the court's statement that "we don't have a property problem." Once waived, a claim typically is "dead and buried; it cannot thereafter be resurrected on appeal." United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009).

The defendants advance yet a third challenge to the sufficiency of the evidence of Hobbs Act extortion. Their challenge trumpets that the government failed to prove that their conduct "obstructed, delayed, or affected interstate or international commerce." Cruz-Arroyo, 461 F.3d at 75 (citing 18 U.S.C. § 1951(a)). This ipse dixit does not withstand scrutiny.

"The scope of the Hobbs Act extends as far as Congress's power to regulate conduct under the Commerce Clause." United States v. Rodríguez-Casiano, 425 F.3d 12, 14 (1st Cir. 2005). To affect commerce for purposes of the Hobbs Act, it is not necessary that the charged crime be soaked in the stream of commerce. To the contrary, "[w]e have regularly held that commerce is 'affected'

for the purposes of the Hobbs Act if there is a 'realistic probability of a de minimis effect on interstate commerce.'" United States v. Capozzi, 486 F.3d 711, 725-26 (1st Cir. 2007) (quoting United States v. McKenna, 889 F.2d 1168, 1171-72 (1st Cir. 1989)). "Even potential future effects may be the basis for interstate commerce jurisdiction under the Hobbs Act." Id. at 726.

Struggling to place themselves beyond the reach of these precedents, the defendants posit that, when the victim of a Hobbs Act crime is an individual rather than a business, the de minimis standard no longer pertains. They instead insist that a "heightened showing" of an effect on interstate commerce is required. Building on this porous foundation, they charge that the government failed to satisfy this enhanced requirement.

The defendants' argument appears to rest on a misreading of our case law. They stake their claim principally on our decision in United States v. McCormack, 371 F.3d 22 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1098 (2005). While it is true that we referred there to a "heightened standard" to be applied to Hobbs Act crimes directed at an individual, id. at 28, we clarified in United States v. Nascimento that this language "relates to the degree of scrutiny, not the quantum of proof," 491 F.3d 25, 37 n.3 (1st Cir. 2007). The defendants' insistance that we have endorsed an alternative to the de minimis standard

- 13 -

for individual victims of Hobbs Act crimes is therefore nothing more than wishful thinking. See id. (rejecting argument that government is required to show "a heightened effect on commerce to sustain a Hobbs Act conviction when the victim . . . [i]s not a business"); see also United States v. Shavers, 693 F.3d 363, 375-76 (3d Cir. 2012) (rejecting request to adopt "a heightened interstate commerce requirement when the victim of the alleged crime is an individual rather than a business"); cf. Rodríguez-Casiano, 425 F.3d at 15 (rejecting argument that robbery directed at individual cannot engender sufficient effect on interstate commerce to satisfy de minimis standard).

To be sure, a court must engage in a "multifaceted and case-specific inquiry" when determining whether the de minimis standard has been satisfied. McCormack, 371 F.3d at 28. Moreover, a court must be "more cautious" in applying the standard to criminal acts directed at individuals as such acts "often have a less obvious effect on interstate commerce" than acts directed at businesses. Rodríguez-Casiano, 425 F.3d at 15; cf. United States v. Jiménez-Torres, 435 F.3d 3, 7-8 (1st Cir. 2006) ("Where . . . the crime concerns the robbery of a home rather than of a business, we approach the task of applying the de minimis standard with some caution, lest every robbery (which by definition has some economic component) become a federal crime."). Thus, in McCormack we rejected the government's argument that an "extortionate demand of

- 14 -

$100,000, standing alone, [wa]s sufficient to satisfy" the de minimis standard with respect to an individual victim. 371 F.3d at 28. Despite the fact that the government asserted that "any reasonable factfinder would conclude that, in order to satisfy such an exorbitant demand, the victim would need to liquidate assets in a manner affecting interstate commerce," we concluded that more was necessary to trace the connection between the individual victim's assets and interstate commerce. Id. at 28-29.

Our rejection of the government's proposed rule notwithstanding, we found that the government had shown the requisite de minimis impact on interstate commerce through a tried and true method: demonstrating that the defendant's criminal activity "cause[s] or create[s] the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce." Id. at 29 (alteration in original) (quoting United States v. Collins, 40 F.3d 95, 100 (5th Cir. 1994)); see Cruz-Arroyo, 461 F.3d at 75. Here, as in McCormack, the government embraced this theory — a particularly suitable approach given that the distinction between Torosyan's funds and the Clinic's funds as the target of the crime was "one of form, not of substance." Cruz-Arroyo, 461 F.3d at 75; see United States v. Devin, 918 F.2d 280, 286, 293 (1st Cir. 1990) (finding de minimis standard satisfied where individual was president and proprietor of business

- 15 -

operating in interstate commerce). The government offered evidence to show that the defendants targeted Torosyan because he was the sole investor in the Clinic and that the primary "asset" sought by them was an ownership interest in the business. The government also adduced evidence showing that the Clinic engaged in interstate commerce and that the defendants' attempted extortion had the potential to deplete the Clinic's assets. Taken in cumulation, this evidence was more than enough to ground a finding that the effect on the Clinic's business could be considered in determining whether the government had satisfied the "interstate commerce" element of the Hobbs Act counts. See Cruz-Arroyo, 461 F.3d at 75; United States v. Diaz, 248 F.3d 1065, 1089 (11th Cir. 2001).

The defendants half-heartedly argue that the Clinic — "a Massachusetts limited liability company with no funds held out of state" — was not an "entity engaged in interstate commerce." But this is thin gruel: as the defendants conceded below, the Clinic purchased substantial quantities of drugs and supplies from out-of-state vendors. Activities of this kind are sufficient to warrant a finding that a nexus with interstate commerce exists. See, e.g., Jiménez-Torres, 435 F.3d at 8 (finding Puerto Rican gas station participated in interstate commerce when government showed gas station purchased products from U.S. Virgin Islands); Rodríguez-Casiano, 425 F.3d at 14 (finding Puerto Rican firms that

- 16 -

purchased products from mainland United States were engaged in interstate commerce). And in all events, the Clinic contracted to receive payments from Medicare, a federal program, with a nunc pro tunc effective date of July 1, 2015. That an entity receives regular Medicare payments from the federal government, without more, is enough to establish a nexus with interstate commerce. See Diaz, 248 F.3d at 1090.

In a feat of legal legerdemain, the defendants attempt to switch the focus of their claims to the second component of the depletion-of-assets theory. They argue that the government failed to demonstrate that their attempted extortion had the potential to deplete the Clinic's assets. Because "the completed extortion would merely have transferred [Torosyan's] interest in the Clinic to other individuals," their thesis runs, "[t]he Clinic would not have lost a penny."

This simplistic characterization does not square with the multifaceted and case-specific inquiry required in connection with the de minimis standard. The government adduced evidence that the defendants repeatedly threatened Torosyan (the sole investor in the Clinic) during a period in which the Clinic still depended upon his financial support. The government also showed that the defendants purposed to give a portion of Torosyan's ownership interest to one of their creditors — a person who had no involvement either in constructing or operating the Clinic. The

defendants' attempt to distinguish the ownership interest sought here from the financial resources more commonly targeted in Hobbs Act extortion cases, see, e.g., Devin, 918 F.2d at 286, 293, does not dull the force of this showing.

We summarize succinctly. Based on all the evidence of record, a jury reasonably could find that the defendants' extortionate acts had the potential to chill Torosyan's ardor and reduce the inflow of cash from him to the Clinic without substituting any new source of financial support. The likely result would be that the Clinic would no longer be able to operate in interstate commerce (or, indeed, at all). Given this hypothesis, we think that a jury reasonably could find that the criminal activity had the potential to impact the Clinic's operations in a manner that would deplete its assets and, thus, affect interstate commerce. Cf. United States v. Vega Molina, 407 F.3d 511, 527 (1st Cir. 2005) ("The commission of a violent crime in the workplace inevitably will constitute a wrenching, if unquantifiable, blow to morale and productivity.").

That ends this aspect of the matter. We conclude, without serious question, that the evidence was sufficient to show both that the defendants conspired and attempted to extort property from Torosyan and that their acts had at least a de minimis effect on interstate commerce. Consequently, the district court did not

err in denying the defendants' Rule 29 motions vis-á-vis the extortion counts.

## B. **Jury Instructions**.

The frailty of the defendants' sufficiency-of-the-evidence claims makes short work of their corresponding claims of instructional error. We take a two-tiered approach to an assignment of instructional error: "we afford de novo review to questions about 'whether the instructions conveyed the essence of the applicable law,' while affording review for abuse of discretion to questions about 'whether the court's choice of language was unfairly prejudicial.'" United States v. Sabean, 885 F.3d 27, 44 (1st Cir. 2018) (quoting United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012)).

The defendants' challenges to the jury instructions mirror their challenges to the sufficiency of the evidence. See supra Part II(A). The "obtaining" property and "effect on interstate commerce" claims of instructional error therefore fail for the reasons elucidated above. Because the transfer of property to a third party may comprise "obtaining" property for the purpose of Hobbs Act extortion, the district court did not err in instructing the jury that a defendant could have "obtained the property of another" by means of a transfer of legal right to that property from the victim to "a person that the defendant designates." And because the instruction regarding the interstate

- 19 -

commerce element was substantially correct — the district court told the jury that the government only had to show "any effect at all on interstate commerce," even a "minimal" or "potential" one — the defendants' second claim of instructional error fails.

The defendants' third challenge to the jury instructions echoes their waived sufficiency argument that an ownership interest in the Clinic could not comprise "property" within the meaning of the Hobbs Act because the Clinic was not generating a profit (and, therefore, in Jambulat's words, was "worthless") at the time the crime was committed. The defendants find fault with the definition of "property" set out in the jury instructions: "an economic interest which is capable of being transferred from one person to another." They assert that "there must be some proof that the item has value in order for it to be considered property."

This assertion lacks force. In applying the Hobbs Act, the caselaw consistently has read "property" more broadly than the defendants urge. We agree with the Eleventh Circuit that "the Hobbs Act applies to extortion of property in general." Diaz, 248 F.3d at 1090. As there is no valuation requirement for such property, we find no error in the challenged instruction.[2]

---

[2] David attempts to advance an additional challenge concerning the wording of the jury instructions. Because that challenge was not raised below and because there is no plausible basis for a claim of plain error, we reject it out of hand.

## C. <u>Rule 404(b).</u>

The defendants' last complaint concerning the Hobbs Act counts centers on the notion that the district court abused its discretion when it admitted evidence of the defendants' prior violent acts.  This disputed evidence consisted of testimony by Torosyan and Olga Dorofyeyeva (Jambulat's former girlfriend and a Clinic employee) about conversations in which Dorofyeyeva told Torosyan that David flipped over a table in anger at a prior business; that David once knocked down his girlfriend, also at a prior business; that Jambulat used force against Dorofyeyeva when they were dating; and that Dorofyeyeva had heard that Jambulat stabbed someone in Boston.[3]  The district court concluded that evidence of the defendants' prior violent acts was admissible both to show the defendants' intent to threaten Torosyan and to show Torosyan's state of mind upon hearing those threats.  We review a district court's rulings admitting or excluding evidence for abuse of discretion.  See <u>Sabean</u>, 885 F.3d at 55.

---

[3] We need not linger long over the defendants' argument that the district court abused its discretion in admitting Dorofyeyeva's testimony on redirect examination that Jambulat threatened to cut her if she crossed him.  In support, they point out that Torosyan was unaware of this threat.  What the defendants overlook, however, is that Jambulat's counsel paved the way for this testimony when he asked Dorofyeyeva during cross-examination whether she had ever heard Jambulat threaten anyone.  Where, as here, the defendant opens the door wide, the district court acts well within the compass of its discretion in permitting the government to go through the door.  See <u>United States</u> v. <u>Balthazard</u>, 360 F.3d 309, 317 (1st Cir. 2004).

Our lodestar is Federal Rule of Evidence 404(b). Although the rule provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it goes on to provide that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). To determine whether other-acts evidence should be admitted under Rule 404(b), a trial court must engage in a two-step analysis. See United States v. Lopez-Cotto, 884 F.3d 1, 13 (1st Cir.), cert. denied, 139 S. Ct. 124 (2018); Devin, 918 F.2d at 286. First, it "must ascertain whether the evidence has a 'special relevance' in that it is offered not to show a defendant's evil inclination but rather to establish some material fact." Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1373 (1st Cir. 1991) (quoting United States v. Hadfield, 918 F.2d 987, 994 (1st Cir. 1990)). "If the trial court finds sufficient relevance, the next step requires that it gauge probative weight against prejudicial effect[.]" Id. This balancing is to be conducted in pursuance of Federal Rule of Evidence 403. See id.

With respect to the first step, we detect no abuse of discretion. As the court below concluded, the evidence of prior violent acts was specially relevant to the defendants' intent to

- 22 -

threaten Torosyan. After all, "whether a defendant has attempted to induce fear in a victim depends only in part on what the defendant has said or done to the victim. It also depends on what the defendant thinks or reasonably should think the victim independently believes about the context in which both are operating." United States v. Goodoak, 836 F.2d 708, 714 (1st Cir. 1988). Where, as here, the defendants had reason to believe that Torosyan would have learned of their prior violent acts,[4] they could rely on him "to put two and two together and to feel afraid." Id. Thus, the disputed evidence was relevant to a determination concerning what the defendants likely thought Torosyan believed about the context in which all three operated. It follows that the district court did not abuse its discretion in concluding that evidence of the defendants' prior violent acts was specially relevant to the jury's assessment of the defendants' intent.

If more were needed — and we doubt that it is — evidence that Torosyan had been told about the defendants' prior violent acts was also specially relevant to show Torosyan's state of mind, including his reasonable belief in the defendants' threats of

---

[4] For instance, the defendants were well aware that Torosyan worked closely with their former coworkers and girlfriends. In addition, Torosyan testified that he had communicated with David concerning at least some of the acts that Dorofyeyeva had described to him. On this record, a jury reasonably could conclude that the defendants premised their threats on an understanding that Torosyan was aware of at least some of their prior violent acts.

- 23 -

violence.  See Iwuala, 789 F.3d at 6.  Where the question is whether the defendants' "words and acts amounted to an attempt to induce fear, the jury is surely entitled to know whether those words and acts did in fact induce fear."  Goodoak, 836 F.2d at 712.  Similarly, evidence concerning the victim's reasonable beliefs about the context in which he and his putative extorter are operating is relevant to show the victim's state of mind.  See id. at 713.

To be sure, Torosyan did not testify in so many words that what he knew of the defendants' prior violent acts made him more fearful.  However, Torosyan did testify that, upon learning of those prior violent acts, he "felt terrible" and "didn't know what to do."  Everything depends on context; and given this description and the setting in which it occurred, a jury reasonably could conclude that Torosyan felt fear.  In the last analysis, there are no magic words that a victim must utter in order to render a putative extorter's prior violent acts relevant to prove state of mind.

This brings us to the second step of the two-step analysis:  the district court's balancing under Rule 403.  "The balance of probative value and unfairly prejudicial effect is, within wide limits, one for the trial court to strike."  United States v. Walker, 665 F.3d 212, 229 (1st Cir. 2011).  "Only rarely — and in extraordinarily compelling circumstances — will we, from

the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighting of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).

We descry no such compelling circumstances here. The defendants' threats were central to the Hobbs Act extortion counts, and — as we have said — evidence that Torosyan knew of the defendants' prior violent acts was probative as to both the defendants' intent to threaten and to Torosyan's perception that he was being threatened. We do not gainsay that evidence of the defendants' prior violent acts, by its very nature, was prejudicial. Cf. United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ("By design, all evidence is meant to be prejudicial."). But that evidence was also significantly probative, and the Rule 403 balance does not insulate a party from any and all evidence that is harmful to his cause. Rather, it "bars only unfair prejudice." Iwuala, 789 F.3d at 8 (emphasis in original).

The defendants argue that because the probative value of the violent acts evidence was minimal and what it was admitted to prove was not in dispute, the admission of such prejudicial evidence was unfair. See United States v. Varoudakis, 233 F.3d 113, 123 (1st Cir. 2000). This argument rests on a faulty premise. Throughout the trial, the defendants continued to asseverate that

the government had failed to show that the intent element was met, asserting that their alleged threats to Torosyan were not made or perceived as preludes to actual violence. The evidence of the defendants' prior violent acts presents a sharp contrast to this characterization and, therefore, conveys significant probative value as to at least one necessary element of the crime that was very much in dispute.

In the end, we think that the able district court performed its balancing function well, and we discern no unfair prejudice here. What is more, any risk of unfair prejudice was palliated by carefully crafted limiting instructions given both before and after Torosyan's testimony and reiterated as part of the court's end-of-case jury instructions. See United States v. Pelletier, 666 F.3d 1, 6 (1st Cir. 2011). We hold, therefore, that the district court did not abuse its discretion in admitting the disputed evidence.

## III. EMBEZZLEMENT

Although the jury convicted David on two counts of embezzlement (counts 3 and 4), the government conceded during the pendency of these appeals that his conviction on count 3 cannot be sustained. Without belaboring the government's reasons for this concession, we limit our analysis to David's conviction on count 4, which charged him with embezzling $2,000 from a "health care benefit program," as defined in 18 U.S.C. § 24(b).

18 U.S.C. § 669(a) prohibits, inter alia, the knowing and willful embezzlement of "moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program."  Congress has defined the term "health care benefit program" to include "any individual or entity who is providing a medical benefit, item, or service for which payment may be made under [a public or private] plan or contract."  18 U.S.C. § 24(b).

David's attack on his conviction under count 4 is three-pronged.  First, he asserts that AHC was not a health care benefit program at the time of the alleged embezzlement.[5]  Second, he asserts that the embezzlement described in count 4 involved funds that came from HMG, a management company distinct from AHC (and not itself a health care benefit program).  Third, he asserts that he was authorized to withdraw the disputed sum under the letter agreement.

At bottom, all three of these claims of error constitute challenges to the sufficiency of the evidence.  Thus, they engender de novo review.  See Iwuala, 789 F.3d at 8.

David's first two assertions need not detain us.  In his post-trial Rule 29 motion, David averred that the government did

_____

[5] Specifically, David tries to argue that because the relevant reimbursement contracts were executed in 2016 and only became effective retroactively for the period that included the date on which the alleged embezzlement occurred, AHC was not a health care benefit program when the charged crime was committed.

not satisfy its burden of proof on count 4 because it had "failed to present evidence that at the time of the alleged embezzlement . . . , [AHC] was a 'health care benefit program' as that term is defined in 18 U.S.C. § 24(b)." Specifically, he argued that the government was obliged to adduce evidence that "there was actually reimbursement" for the medical services rendered. The government rejoined that the parties had stipulated that AHC was a health care benefit program at and after November 1, 2015.

David did not challenge the government's evidence of the stipulation but, rather, changed his tune and debuted his other two sufficiency challenges in a supplemental Rule 29 motion.[6] There, he acknowledged that the government "did present at trial . . . documentation indicating that [AHC] was a health care benefit program and the defendant agreed to stipulate to that fact." Instead, he argued that the government had presented no such evidence for HMG and that, in all events, he was authorized to withdraw the allegedly embezzled sum.

---

[6] On the second day of the sentencing hearing, David's counsel expressed some buyer's remorse regarding the stipulation. He stated that it had become apparent during the trial that "there was [a] lack of evidence . . . regarding treatments being actually made to patients during the relevant time period and requests for reimbursement from these insurance carriers." He nevertheless conceded that any argument as to whether AHC was a health care benefit program was "precluded to the extent there was a stipulation."

Stipulations are an important tool in the orderly administration of justice.  Once made, they cannot be disregarded as lightly as a tarantula sheds its skin.  See Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 6 (1st Cir. 2007).  Having stipulated that AHC was a health care benefit program, "affirmatively agree[ing] to not put the government to its proof of an element of a crime," David "relinquished all other defenses, factual and legal, pertaining to the stipulated element."  United States v. Meade, 175 F.3d 215, 223 (1st Cir. 1999).

David seems to suggest that equitable considerations counsel in favor of relieving him of the burden of the stipulation.  This suggestion is unpersuasive.  For one thing, David never asked the district court to vacate the stipulation, and we are reluctant to entertain a request for relief that could have been made in the district court, but was not.  See Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 41 (1st Cir. 2015) ("As a general rule, a party is not entitled to relief on appeal that she did not seek below."); Beaulieu v. IRS, 865 F.2d 1351, 1352 (1st Cir. 1989) ("[I]t is black letter law that it is a party's first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal.").  For another thing, David entered into the stipulation despite having access to the same facts regarding contractual approval dates, see supra note 5, that he now argues preclude such a finding.  We therefore

- 29 -

discern no hint of inequity in holding David to the stipulation into which he freely entered.

David mounts one last argument concerning the stipulation. He points out that the stipulation was neither entered into evidence nor read to the jury. While it certainly would have been correct practice for the government to have asked the district court to communicate the gist of the stipulation to the jury, David never suggested such a course of action below. Nor did he mention this oversight to the district court at the close of the government's case. Thus, the claim of error that he now advances is nothing but an unpreserved challenge to the sufficiency of the evidence — and we review such challenges only for clear and gross injustice. See United States v. Pratt, 568 F.3d 11, 18 (1st Cir. 2009). We detect nothing resembling an injustice here because David had conceded the facts set out in the stipulation. It follows that the failure to apprise the jury of the stipulation constituted, at most, a technical error. See id. (reaching this conclusion where stipulation was not communicated to jury prior to jury instructions). In the circumstances of this case, that technical error is harmless.

This brings us to David's argument, raised for the first time in his supplemental Rule 29 motion, that the allegedly embezzled sum was withdrawn from an entity (HMG) that the government never established was a health care benefit program.

But David waived this argument: throughout the trial, all of the parties (including David) treated AHC and HMG as a unit. In his summation, for instance, David's trial counsel repeatedly accepted the government's framework that the two entities comprised a single business — "Allied Health" — which he variously referred to as "the business" and "the company." Having treated the Clinic as a single entity comprising both AHC and HMG, David waived any subsequent argument that there was a meaningful distinction between the two entities for purposes of count 4. Cf. United States v. Orsini, 907 F.3d 115, 119-20 (1st Cir. 2018) (holding that defendant who explicitly affirmed fact before district court, had waived issue and could not "resurrect it on appeal").

Of course, courts have discretion to relieve a party of the effects of a waiver in the interests of justice. See United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011). The district court heard arguments bearing on this possibility in connection with David's supplemental Rule 29 motion. The government proffered evidence proving that the funds David withdrew from HMG had been transferred directly from AHC to HMG that same day. David did not contest the veracity of this evidence, and the district court declined to excuse David's waiver. We think that this ruling was a sound exercise of the district court's discretion.

David's last assignment of error focuses on whether the evidence was sufficient to show embezzlement under 18 U.S.C. § 669. Some background is helpful. An individual who "knowingly and willfully embezzles, steals, or otherwise without authority converts" moneys or assets of a health care benefit program violates Section 669. "The crime of embezzlement has long had a clear meaning[:] . . . 'the fraudulent conversion of the property of another by one who is already in lawful possession of it.'" United States v. Young, 955 F.2d 99, 102 (1st Cir. 1992) (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 8.6, at 368 (1986)). An individual engages in fraudulent conversion when, for instance, he "us[es] money entrusted to him by another person for his own purposes or benefit and in a way that he knows the 'entruster' did not intend or authorize." Id.

Here, the government posited that David embezzled funds from AHC when he withdrew $2,000 toward his salary for the month of November despite having agreed that a $3,000 loan from Torosyan would comprise his salary for that month, if not repaid.[7] In support, the government presented Torosyan's testimony about the loan and the lack of any repayment. It also introduced evidence

---

[7] Earlier in the month, David also withdrew $1,500 toward his November salary. This withdrawal of funds was the centerpiece of count 3 — a count that the government has now disavowed.

of Torosyan's check for $3,000 bearing a notation that it was "borrowed."

David's argument in opposition is that he acted with authority when he withdrew the funds because the letter agreement entitled him to "an incremental additional amount of salary" once the Clinic was operational. The district court rejected this argument and so do we. Merely pointing to abstract authority that may entitle an individual to withdraw funds does not establish as a matter of law that a particular withdrawal was authorized. See United States v. García-Pastrana, 584 F.3d 351, 375-76 (1st Cir. 2009). Based on the evidence of record, a jury reasonably could conclude — as this jury did — that the $2,000 withdrawal was not authorized because David took that sum in violation of his agreement with Torosyan. Consequently, the district court did not err in refusing to order judgment of acquittal on count 4.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

David has one last shot in his sling. Represented by new counsel on appeal, he alleges for the first time that his trial counsel provided him with constitutionally ineffective assistance, in derogation of the Sixth Amendment. See U.S. Const. amend VI; see also Strickland v. Washington, 466 U.S. 668, 687 (1984). "We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance of counsel cannot make their debut on direct review of criminal convictions, but, rather,

- 33 -

must originally be presented to, and acted upon by, the trial court." United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993). This prudential rule rests on sound reasoning. As we explained in Mala, ineffective assistance claims "typically require the resolution of factual issues that cannot efficaciously be addressed in the first instance by an appellate tribunal." Id. "[T]he trial judge, by reason of his familiarity with the case, is usually in the best position to assess both the quality of the legal representation afforded to the defendant in the district court and the impact of any shortfall in that representation." Id.

There is, of course, an isthmian exception to the Mala rule. When "the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration" of an ineffective assistance of counsel claim, we may, as a matter of discretion, adjudicate the claim ab initio. United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991). Elsewise, the proponent of a previously unexplored ineffective assistance of counsel claim must raise it in a collateral proceeding brought under 28 U.S.C. § 2255. See, e.g., United States v. Santana-Dones, 920 F.3d 70, 82-83 (1st Cir. 2019); United States v. Miller, 911 F.3d 638, 640 (1st Cir. 2018).

The Mala rule fits this case like a glove. The record before us is rife with ambiguities that prevent us from determining

whether or not David's representation satisfied the Sixth Amendment standard. Of critical importance, there is little in the record to illuminate "why [David's] lawyer[] did what [he] did." United States v. Moran, 393 F.3d 1, 10 (1st Cir. 2004). Without this information, it is virtually impossible to assess what reasoning, if any, guided counsel's actions. United States v. Ladd, 885 F.2d 954, 961 (1st Cir. 1989) ("[R]obes and gavels are the tools of a jurist's trade — not tea leaves or crystal balls."). Here, as in Moran, "[f]actfinding will be required to make th[ose] determination[s], which means that the district court should hear the claim in the first instance." 393 F.3d at 11. We therefore dismiss this claim of error; without prejudice, however, to David's right, if he so elects, to raise it through a petition for post-conviction relief under 28 U.S.C. § 2255.

## V. CONCLUSION

We need go no further. For the reasons elucidated above, we reverse David's conviction on count 3 and otherwise affirm the convictions of both defendants; without prejudice, however, to David's right, if he so elects, to prosecute his ineffective assistance of counsel claim through a petition for post-conviction relief under 28 U.S.C. § 2255. We remand with instructions to the district court to consider whether and to what extent (if at all) a modification of David's sentences on counts 1, 2, and 4 may be in order. See United States v. García-Ortiz, 657 F.3d 25, 31 (1st

- 35 -

Cir. 2011) ("When a defendant successfully challenges one of several interdependent [counts], the proper course often is to remand for resentencing on the other (non-vacated) counts."); United States v. Genao-Sánchez, 525 F.3d 67, 71 (1st Cir. 2008) (holding remand appropriate where dropped counts may "alter the dimensions of the sentencing 'package'"); see also United States v. Pimienta-Redondo, 874 F.2d 9, 14 (1st Cir. 1989) (en banc) ("[W]hen a defendant is found guilty on a multicount indictment . . . [, and] the conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original [sentencing] plan, and to reconstruct the sentencing architecture upon remand.").  The district court should, at the same time, revise the special assessments and the restitution order in David's case to reflect the reversal of his conviction on count 3.

**So Ordered.**