# United States Court of Appeals
## For the First Circuit

No. 18-1503

UNITED STATES,

Appellee,

v.

RICHARD VALENTINI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Seth Kretzer for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

December 10, 2019

**LYNCH**, **Circuit Judge**.  A jury convicted Richard Valentini on December 18, 2017, of one count of conspiracy to commit Hobbs Act extortion and one count of aiding and abetting the same.  18 U.S.C. §§ 2, 1951.  The defendant and his cohorts, ostensibly members of an organized crime organization in the Springfield, Massachusetts area, tried to extort money from Craig Morel, the owner of an interstate towing company, through means such as threatening Morel with death, striking Morel in the face, and telling Morel his access to towing contracts for his business with state and municipal governments depended on his making the extortion payments.

The defendant primarily challenges the sufficiency of the evidence.  The evidence was more than sufficient to support the verdict on both crimes.  We also reject two legal arguments he makes, which misinterpret the Hobbs Act.  We stress again that the "obtaining of property" element of the Act does not require the government to prove that the defendant personally benefitted or took possession of the property.  We affirm.

                                    I.

We recite the evidence in the light most favorable to the verdict.  See United States v. Pena, 910 F.3d 591, 597 (1st Cir. 2018).

A.    The Extortion Scheme

Morel owns and operates CJ's Towing, a vehicle towing and storage company in Springfield, Massachusetts.  CJ's Towing has had state and municipal contracts (for example, for the Massachusetts Turnpike and Massachusetts State Police ("MSP")) and contracts with private automobile clubs, such as Allstate Roadside.  CJ's Towing also tows and services vehicles out of state and transports individuals whose vehicles have broken down around Springfield across state lines to Connecticut, New York, New Hampshire, and Vermont.

In September 2000, CJ's Towing purchased another towing company and assumed its contracts with the MSP and Springfield police.  After that purchase, a local organized crime figure, Frank Depergola, told Morel he would have to pay the mob to provide kickbacks to city officials to ensure that Morel and his company retained these contracts.  Morel complied and paid.  Nearly a year later, Morel learned the kickbacks he paid went to Al Bruno, the leader of the New York-based Genovese crime family's "crew" in Springfield. Fearing reprisal if he stopped, Morel continued paying the kickbacks.  In October 2003, Morel stopped making those payments after CJ's Towing lost its City of Springfield towing contract, as it was apparent that Depergola and Bruno could not deliver on their promises to see the contracts continued. Attempts to collect the unpaid kickbacks from Morel ceased when

Bruno was murdered a month later and law enforcement arrested Anthony Arillotta, one of Bruno's associates.

Almost a decade later, in August or September of 2013, Morel was told that a new crew, headed by Ralph Santaniello and comprised of at least Albert Calvanese, Valentini, and John Basile, would soon begin demanding extortion payments from him. On September 30, 2013, Santaniello and Giovanni "John" Calabrese approached Morel at Morel's secluded Hampden, Massachusetts home and demanded both back payments they claimed Morel owed to Bruno and money for future protection.[1] They also threatened Morel's life if he failed to cooperate or if he contacted law enforcement, and Santaniello struck Morel in the face. Santaniello initially demanded $50,000 in arrears and $4,000 per month in ongoing payments but, after some resistance by Morel, reduced his demand to $20,000 in arrears and $2,000 per month.

Morel then sought help from his best friend, an MSP trooper, who referred him to another MSP officer. On October 4, 2013, the MSP fitted Morel with a hidden recording device and gave Morel $5,000 to give as an extortion payment to the new crew and to see how they would react to an insufficient payment. Later

---

[1] We add that there is no evidence state and local governments knew of or participated in such extortion, only that organized crime figures in Springfield represented that they could influence the grant or termination of contracts with state and local governments.

- 4 -

that day, Calabrese brought Valentini with him to collect the money from Morel at Morel's house. Valentini is a big, strong man, bigger than Morel, and, after Morel expressed concern about being extorted, Valentini told him to "relax." Valentini then guaranteed that, in return for continued payments, Morel would be "all set" with a City of Springfield contract and would win a Massachusetts Turnpike contract. When Morel stated he would pay, Valentini stated that Morel was "going to get treated just as good as Al [Bruno] . . . treated [him]." Valentini then stated that Morel was "never going to have a problem with anybody." Calabrese asked Morel to tell them if he had any issues with anyone, and Valentini said: "[I]t's going to end. I guarantee you it will end." Valentini and Calabrese told Morel they would help him in "certain areas," e.g., help Morel obtain towing contracts in exchange for continued payments. Specifically, Valentini stated: "If you need help in certain areas, we can help you out." Later, Valentini stated: "And the only time you gotta see us is when you have a problem. . . . [Y]ou don't want to hang around with us like every day." At Calabrese's demand, Morel then gave him $5,000. Morel stated he could only pay the rest "piecemeal" over the next few weeks. Calabrese responded that paying over the next week or few weeks was acceptable, but the first payments would need to total $20,000 and then Morel would need to pay $2,000 every month

going forward.  During this exchange about the payments, Valentini was "nodding and kind of participating in the conversation."

Morel complained about how "steep" the payments were and said he needed more time to pay the entire arrears sum.  Valentini said this was acceptable, so long as Morel did not take too long, stating: "Yea.  I mean, you know, not a marathon but you know you can . . . you can do, you know."  (Ellipsis in original.) Calabrese told Morel that either Calabrese or Valentini would return to Morel's home the following Wednesday at 4:00 p.m. for the next payment.  Valentini was part of this discussion about the next meeting.  The October 4 meeting was the only meeting with Morel in which Valentini participated.

There were multiple additional meetings in October and November 2013 during which the crew demanded that Morel pay the remaining $15,000 of the agreed-upon arrears amount.  At an October 9 meeting, at the request of the MSP, Morel gave Calabrese only $500 instead of the $5,000 he had promised.  Later that day, Calabrese and Santaniello visited Morel and angrily threatened him with implied death and other violence.  Santaniello then aggressively opened Morel's shirt (looking for, and failing to find, recording devices).  Both Calabrese and Santaniello threatened to "get rid of" Morel's towing contracts if Morel did not pay the remaining portion of the $15,000 by the next Friday. A similar incident, in which Morel intentionally did not pay as

much as promised and Santaniello threatened Morel at a coffee shop in East Longmeadow, occurred on October 15.

On October 16, Morel met with Depergola to confirm that Santaniello and the others actually ran the Springfield organized crime crew. Santaniello and Calabrese attended that meeting unannounced. Shortly after, law enforcement observed Depergola, Santaniello, Calabrese, and Valentini sitting at a West Springfield restaurant and speaking in low tones.

At a meeting on October 22, 2013, at the East Longmeadow coffee shop, Morel once more told Calabrese he would not pay the money. This resulted in an October 23, 2013 encounter at the same coffee shop among Morel, Depergola, Santaniello, and Calabrese, in which the crew tried to get Morel to say that they had never struck or threatened him. On November 8, 2013, Morel met Depergola, at the MSP's request, and Depergola stated that Morel's ordeal would end if he paid the remainder of the $20,000 arrears sum. Morel left the meeting and, minutes later, MSP troopers observed that Valentini arrived, briefly spoke with Depergola, and left.

After Morel agreed to pay the remaining sum, he met with Depergola three more times. At a November 20, 2013 meeting, Morel stated "four different people," including Valentini, had demanded money from him. Depergola in turn stated that Valentini would be at the meeting at which Morel would pay the remaining sum. On November 25, 2013, Morel gave the remaining arrears payment to

Depergola, Santaniello, and Calabrese, who all assured Morel they would not seek more money from him. Valentini was not present at the meeting.

The FBI arrested Valentini, Santaniello, Depergola, and Calabrese on August 4, 2016.

B. Procedural History

A federal grand jury indicted Valentini, Santaniello, Depergola, and Calabrese for conspiracy to interfere with commerce by threats or violence, in violation of 18 U.S.C. § 1951, and interference with commerce by threats or violence and aiding and abetting the same, in violation of 18 U.S.C. §§ 2, 1951. Valentini went to trial. The other defendants entered into plea agreements with the government and pleaded guilty. None of these co-defendants testified at Valentini's trial, as none of them had been sentenced and all had invoked their rights against self-incrimination.

At the close of the government's case in chief, Valentini moved for judgment of acquittal but asked the district court to defer ruling on the motion. The jury convicted Valentini on both counts. At a post-trial hearing, Valentini raised his pending motion for judgment of acquittal and specifically argued that he had not participated in the conspiracy because he had attended only one meeting with Morel, and that the crime did not affect interstate commerce because the money obtained belonged to law

enforcement, not Morel.  The district court denied the motion and sentenced Valentini to a 20-month term of imprisonment.  This appeal followed.

## II.

### A.  Standard of Review

We review de novo a preserved challenge to a denial of judgment of acquittal.  See United States v. George, 761 F.3d 42, 48 (1st Cir. 2014).  We make "all reasonable inferences and credibility choices in the government's favor" and then determine whether a rational jury could have convicted the defendant.  Id. We assume without deciding that Valentini properly preserved his arguments and so they are accorded de novo review.[2]

### B.  Evidence of Voluntary Participation in the Extortion Scheme

Valentini's first argument on appeal is that the evidence presented to the jury was insufficient to demonstrate his voluntary participation in the conspiracy.  He contends that the words he spoke in the October 4 meeting were gibberish and so do not prove that he was a member of the conspiracy to extort Morel. He claims that neither his mere presence at the meeting nor the

---

[2]    There is some dispute as to whether Valentini failed to properly preserve his "obtaining of property" and "interstate commerce" element claims.  If so, they would be accorded review for "clear and gross injustice."  United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012) (quoting United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999)).  But, as Valentini's arguments lack merit under either standard of review, we need not reach this issue.

fact that he drove Calabrese to the meeting is sufficient evidence for a rational jury to convict him of the conspiracy charge beyond a reasonable doubt.

The Hobbs Act prohibits "obstruct[ing], delay[ing], or affect[ing] commerce . . . by robbery or extortion." 18 U.S.C. § 1951(a). The Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2). To convict a defendant of a Hobbs Act conspiracy, the government must prove that the defendant possessed "an intent to agree and an intent to commit the substantive offense." United States v. Morales-Machuca, 546 F.3d 13, 20 (1st Cir. 2008) (quoting United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000)).

A jury easily could have found beyond a reasonable doubt that Valentini conspired to extort Morel. Valentini's argument on appeal is that he spoke only meaningless gibberish at the October 4 meeting. Not so. Valentini (1) tried to calm Morel so he would cooperate with the extortion scheme; (2) said that the benefits of paying the arrears would equal those Morel had received from Bruno; (3) stated that, in exchange for the payments, he and the rest of the crew would "end" any problems Morel experienced; (4) assured Morel that he and the crew would not seek payments that would prevent CJ's Towing from operating; and (5) actively

- 10 -

participated in the discussion about the next meeting, at which, according to Calabrese, either Calabrese or Valentini would collect the next payment. From these facts, a jury could reasonably infer that Valentini understood and knew of the original extortion arrangement between Morel and Bruno's crew, what had happened between Morel and Santaniello four days earlier, and what could happen between the Springfield crew and Morel in the future if Morel did not comply with the crew's payment demands. A jury could conclude that Valentini was promising that he and the rest of Santaniello's crew would treat Morel just as well as Bruno had treated him and, in exchange for the extortion payments, they would provide Morel protection and resolve any of Morel's problems.

Moreover, when discussing the future relationship of Morel and the Springfield crew, Valentini used the words "we" and "us" when referring to the crew. And when Morel, Valentini, and Calabrese were planning when and to whom Morel should make the next payment, Calabrese repeatedly used the term "we" and stated that either he or Valentini would pick up the next payment (further aligning Valentini with the extortion scheme).[3] Finally, within

---

[3] Calabrese similarly referred to Valentini's participation in the conspiracy at the October 9 meeting. Calabrese, referring to the October 4 meeting between Morel, Calabrese, and Valentini, stated: "Me and my other friend . . . made you feel so comfortable. . . . [W]e're on your side. We're here to help you, not hurt you." And, at the November 20, 2013 meeting between Morel and Depergola, Depergola stated that he would bring Valentini with him to the meeting at which Morel would pay

- 11 -

minutes after a November 8, 2013 meeting between Morel and Depergola (at which they discussed the extortion payments), the MSP observed Valentini arrive and meet with Depergola.

This evidence permitted a rational jury to infer that Valentini was a member of the Springfield crew that was extorting Morel and that he intended to participate in the extortion. We conclude that the evidence was sufficient to prove that Valentini not only drove Calabrese to and was present at the meeting, but also voluntarily participated in the conspiracy to extort Morel.

C.    Valentini's "Obtaining of Property" Element Argument

Valentini argues that the word "obtaining" in the Hobbs Act phrase "the obtaining of property" requires that the defendant take personal possession of the property. 18 U.S.C. § 1951(b)(2). He bases this argument on language in Sekhar v. United States, 570 U.S. 729 (2013), Scheidler v. National Organization for Women, Inc., 537 U.S. 393 (2003), and United States v. Green, 350 U.S. 415 (1956), and argues that the government must prove he took actual possession of the property. He then asserts there is no evidence he directed property to another or received a personal benefit.

To satisfy the "obtaining of property" element of Hobbs Act extortion, our law is clear that the defendant need not receive

_____

the remaining extortion payment.

- 12 -

any _personal_ benefit or take personal possession of the property[4]:
directing the transfer of property to a third party is enough.
United States v. Brissette, 919 F.3d 670, 678 (1st Cir. 2019)
(applying United States v. Green, 350 U.S. 415 (1956), and Sekhar).
Further, this court said in United States v. Tkhilaishvili, 926
F.3d 1 (1st Cir.), cert. denied, __ S. Ct. __ (2019):

> In their view, the government had to show that
> the defendants sought to take possession of
> the extorted property for themselves or, at
> the very least, that they somehow sought to
> benefit from the extortionate transfer.
> This contention is simply wrong.  As we
> recently explained, a defendant may "obtain"
> property within the meaning of the Hobbs Act
> by bringing about its transfer to a third
> party, regardless of whether the defendant
> received a personal benefit from the transfer.

Id. at 10.  Valentini's proffered interpretations of Green,
Sekhar, and Scheidler are simply wrong, and we refer the reader to
Brissette and Tkhilaishvili for the reasons why.

Valentini attempts to distinguish Brissette on the
ground that it concerned the sufficiency of an indictment and not
the sufficiency of the evidence to support a conviction.  But this
argument fails.  Brissette did not cabin its holding to the
sufficiency of an indictment.  Instead, the Brissette court
interpreted the phrase "'obtain[s] . . . property' within the

---

[4]    Accordingly, Valentini's argument that the government
was required to prove that he took possession of Morel's payment(s)
is without merit.

- 13 -

meaning of the Hobbs Act extortion provision" and then applied that interpretation in a sufficiency of an indictment analysis. 919 F.3d at 672, 680 (alteration and omission in original). Valentini provides no argument why the interpretation of the Hobbs Act differs between analyses of the sufficiency of an indictment and of the evidence supporting a conviction. Moreover, in Tkhilaishvili, we applied the Brissette rule to a sufficiency of the evidence argument. 926 F.3d at 10-11.

Valentini's reliance on the rule of lenity to support reading the "obtaining of property" element to require that the defendant obtain actual possession of the property is similarly unavailing, as the Hobbs Act is unambiguous as to this provision. The rule of lenity applies "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." See United States v. Hayes, 555 U.S. 415, 429 (2009) (quoting United States v. Shabani, 513 U.S. 10, 17 (1994)). We analyzed the text of the "obtaining of property" element in detail in Brissette and found no ambiguity in the statute. See 919 F.3d at 676-78. Valentini's invocation of the rule of lenity is therefore misplaced.

A rational jury could have found that Valentini conspired in, and aided and abetted, a scheme that brought about the transfer of property (i.e., the arrears payments) from Morel to third parties (i.e., members of the Springfield crew) and so

- 14 -

that the government satisfied its burden with respect to this element.

D.   Valentini's "Interstate Commerce" Element Argument

Valentini separately argues that the government failed to meet a "heightened standard" of an effect on interstate commerce because, in his view, the criminal charges involved Morel as an individual, not a business.

If the government proves "a realistic probability that the attempted extortion [would have had] some slight impact on [interstate] commerce," the Hobbs Act applies.  United States v. Devin, 918 F.2d 280, 293 (1st Cir. 1990).  We have said that we apply a "heightened standard" of scrutiny to cases involving the extortion of an individual, rather than a business, but our close review of the facts does not alter the de minimis "quantum of proof" for showing the requisite effect on interstate commerce. Tkhilaishvili, 926 F.3d at 11–12 (quoting United States v. Nascimento, 491 F.3d 25, 37 n.3 (1st Cir. 2007)).  Although "a court must be 'more cautious' in applying the standard to criminal acts directed at individuals as such acts 'often have a less obvious effect on interstate commerce' than acts directed at businesses," the government still only needs to show a "de minimis impact."  Id. at 12 (quoting United States v. Rodríguez-Casiano, 425 F.3d 12, 15 (1st Cir. 2005)).  We address two separate questions here: (1) whether Valentini was extorting an individual

- 15 -

or a business; and (2) whether the evidence was sufficient to satisfy the interstate commerce element.

First, there was sufficient evidence to show that Valentini and the Springfield crew targeted Morel as the owner of a business.  To obtain the extortion payments, Santaniello, Calabrese, Depergola, and Valentini used both the promise of obtaining new contracts for, and the threat of eliminating existing contracts of, CJ's Towing, Morel's business.  In consequence, we need not address Valentini's "heightened standard" argument.

Second, there was sufficient evidence to show that targeting Morel as the owner of CJ's Towing affected interstate commerce.  To satisfy this element, the government need only show "that the defendant's activity 'minimally deplete[d] the assets of an entity doing business in interstate commerce."  United States v. Capozzi, 347 F.3d 327, 337 (1st Cir. 2003) (quoting United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001)); see also id. ("To establish a Hobbs Act violation, the government need not show an actual deprivation of assets, but only that a deprivation of the victim's assets would have occurred had the defendant succeeded in the extortion.").  CJ's Towing routinely operated across state lines and serviced out-of-state customers.  A rational jury could find that successfully extorting money from Morel, in his capacity

as the owner of CJ's Towing, could deplete the assets of CJ's Towing and impact interstate commerce.[5]

Affirmed.

---

[5] We briefly note that, although Valentini mentions in passing that the money that Morel paid to the Springfield crew came from law enforcement, he has waived the argument that he made in the district court that the origin of these funds means that the extortion could not have affected interstate commerce. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).